## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CARLOS MORENO-GASCA, et. al.

Case No. 19-CR-146

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

On May 9, 2019, the Grand Jury returned an indictment against Defendants Carlos Moreno-Gasca ("Moreno"), Ubaldo Sanchez ("Sanchez"), and one other co-defendant, Isauro Chavez ("Chavez"). [13], [40]. The indictment charged Defendants Moreno and Sanchez in two counts: (1) conspiracy to distribute at least 100 grams of heroin, in violation of 21 U.S.C. § 846 (Count II); and (2) possession with intent to distribute at least 100 grams of heroin, in violation of 21 U.S.C. § 841(a)(1) (Count III). [13], [40].

Sanchez and Moreno moved to quash their February 20, 2019 arrests and suppress subsequently derived evidence, including incriminating statements they made to officers at the police station, [78]; [138]. Both Defendants allege that their arrests by law enforcement, including agents from the Drug Enforcement Administration ("DEA"), violated the Fourth Amendment, and consequently, that this Court should exclude all evidence derived from the unlawful arrests. [78] at 10; [138] ¶ 7–8; *Wong Sun v. United*

1

*States*, 371 U.S. 471 (1963) (requiring suppression of unlawfully obtained evidence and any "fruit of the poisonous tree.").

On June 27, 2022 and July 22, 2022, this Court held an evidentiary hearing regarding Defendants' motions. [165], [166]. During the hearing, the Government presented testimony from two DEA Task Force Officers, Phillip Hahn and Chris Marshall. Defendant Sanchez presented the testimony of his wife, Stephanie Villagran. Both parties also introduced photographs, video recordings, maps, communication transcripts, and other evidence. The Court directed the parties to file any supplemental materials in support of their respective positions by August 10, 2022. [171]. The Government submitted materials without defense objection, [172], [172-1], [172-2], and Defendants filed none of their own.

Based upon this record, which includes the materials submitted by the parties, the evidence presented at the hearing, and the Government's supplemental filings, this Court makes its factual findings and draws the resulting conclusions of law.

## I.  Findings of Fact

Based upon this Court's observations at the evidentiary hearing, the law enforcement witnesses provided credible testimony which was corroborated by other evidence in the record. Based on the evidence, this Court finds as follows:

In January 2019, a confidential source ("CS") informed law enforcement that Chavez had been supplying the CS with heroin and cocaine since approximately March 2016. Gov. Ex. 1 ¶¶ 6, 15. The CS further informed law enforcement that on several occasions, he had purchased controlled substances from Chavez at his residence, a

trailer home located at 768 Maple Lane in Justice, Illinois (the "Trailer"). *Id.* ¶¶ 6, 16.

On January 16, 2019, at the direction of law enforcement, the CS contacted Chavez to arrange the purchase of 150 grams of heroin in exchange for $9,000. *Id.* ¶ 18. The next day, the CS traveled to the Trailer and parked in its driveway. Gov. Ex. 1 ¶ 23. Law enforcement observed Chavez exit the Trailer and enter the front passenger seat of the CS's vehicle. *Id.* ¶ 24. While in the vehicle, Chavez provided the CS with 150 grams of heroin in exchange for $4,500. *Id.* ¶ 24. After the transaction, law enforcement saw Chavez exit the CS's vehicle; enter the passenger seat of a vehicle driven by Chavez's brother, Ernesto Chavez; and drive away. *Id.* ¶ 26.

While conducting subsequent surveillance on January 24, 2019, law enforcement saw a silver Dodge Neon with Tennessee license plates arrive at and later leave the Trailer. [165]. Following its departure, law enforcement observed the silver Dodge conduct a "heat run," a common counter-surveillance tactic that can show a driver whether someone is following him. *Id.*

On January 25, 2019, law enforcement observed as the CS drove to the Trailer. Upon the CS's arrival, officers saw Chavez exit the Trailer and enter the passenger seat of the CS's vehicle. Gov. Ex. 1 ¶ 35. The CS gave Chavez the remaining $4,500 from the January 17, 2019 narcotics transaction; upon the conclusion of the transaction, Chavez returned to the Trailer. *Id.* ¶¶ 34, 35, 36.

On February 18, 2019, the CS agreed to purchase additional heroin and cocaine from Chavez, and the two arranged an exchange, to take place on February 20, 2019. *Id.* ¶¶ 38–40. As part of its investigation of Chavez, law enforcement then sought and

obtained a search warrant for Chavez's person and for the Trailer, authorizing them to arrest Chavez and to seize narcotics, paraphernalia, records, photographs, firearms, and cash, as well as electronic storage media found in the Trailer. *See* [1].

Pursuant to the search warrant, on February 20, 2019, law enforcement began surveilling the Trailer at approximately 3:30 p.m. Officer Hahn positioned himself northeast of the Trailer in an unmarked vehicle; Officer Marshall was located nearby. [165]; Gov. Ex. 4. Both officers brought significant experience to the investigation: each possesses a decade or more of prior experience in law enforcement and has participated in at least one hundred narcotics investigations. [165].

On the afternoon of February 20, 2019, DEA Task Force Officer Brette Glomb monitored the CS's communications with Chavez over WhatsApp and provided updates to the other law enforcement officers involved in the investigation. [168]. Specifically, Officer Glomb informed other officers that the purchase between the CS and Chavez would occur in the Trailer's driveway. *Id*. In the monitored WhatsApp conversation between Chavez and the CS, Chavez also informed the CS that his "guy" with the narcotics would arrive at the Trailer around 3:30 p.m., and then, at approximately 3:38 p.m., Chavez told the CS that his "guy" was ten minutes away. *Id*.

At approximately 4:07 pm, Officer Hahn observed two individuals in a black Honda drive up to the Trailer. Gov. Ex. 1 ¶ 42; [165]. Officer Hahn viewed the occupants of the car as they drove by [165]. Officer Hahn could see two individuals in the Honda: a driver, wearing a "grayish" coat, and a passenger, a white male wearing a black coat and a black baseball hat. [165]. Officer Hahn testified credibly that he

4

was able to see the passenger's face, and that the car did not have tinted windows. *Id.* Officer Hahn relayed his observations to other members of law enforcement, including Officer Marshall. *Id.*

Based on the timing, Officer Hahn reasonably believed that the individuals in the black Honda were, in fact, the narcotics suppliers Chavez, as referenced in Chavez' messages to the CS. *Id.* About a minute after Officer Hahn observed the black Honda pull into the Trailer's driveway, Officer Hahn drove past the Trailer and observed the driver (identified as Defendant Moreno), still wearing a grey coat, standing outside the black Honda, smoking a cigarette. *Id.*; Gov. Ex. 5; Gov. Ex. 5A. After returning to his original surveillance position, Officer Hahn then observed Chavez standing at the end of the Trailer's driveway, smoking a cigarette. [165]. Approximately five minutes later, Officer Hahn conducted another drive by and observed Chavez re-enter the Trailer. *Id.* Officer Hahn then returned to his surveillance position. *Id.*

Aside from the black Honda and the CS's vehicle, Officer Hahn did not observe any other vehicles arriving at or departing from the Trailer. *Id.* Nor did he observe any individuals approaching the location on foot. *Id.*

At 4:09 p.m., approximately two minutes after Officer Hahn observed the black Honda, the CS sent a message to Chavez in the monitored WhatsApp conversation that said "I'm getting close are u guys ready?" Gov. Ex. 2. Chavez responded immediately, saying "Yes." *Id.* Four minutes later, Chavez messaged again, asking the CS "Are u close were here already." *Id.*

At approximately 4:41 pm, Officer Hahn observed the CS's vehicle arrive and

park in the driveway of the Trailer. Gov. Ex. 1 ¶ 43; [165]. Two minutes later, Officer Hahn observed Chavez enter the front passenger seat of the CS's vehicle. Gov. Ex. 1 ¶ 43; [165]. Monitoring the CS's audio transmitter, Officer Hahn heard the CS tell Chavez that he had money in the trunk. [165]. Moments later, Officer Hahn saw the CS exit the vehicle, walk toward the trunk, and employ a prearranged signal, prompting law enforcement agents to arrest Chavez and execute the search warrant. *Id*. Other officers detained Chavez and recovered approximately 200 grams of heroin from the CS's vehicle. *Id.* at 22:16–23:6.

Officer Hahn, Officer Marshall, and other law enforcement officers then approached the Trailer to execute the search warrant. Gov. Ex. 1 ¶ 44; [165]. At the front door, they encountered two individuals: a woman and her preteen son. [165]. Officers instructed them to exit the trailer and relocate to an area on the street, which they did. *Id*. At the threshold of the Trailer, Officer Hahn also encountered another individual, Ernesto Chavez, brother to Isauro Chavez. *Id*. After identifying himself as a law enforcement agent, Officer Hahn asked Ernesto Chavez to put his hands on his head and come outside. *Id*.

Based upon his prior observations, Officer Hahn determined that the three individuals he had encountered thus far—the woman, her son, and Ernesto Chavez—were not the occupants of the black Honda. *Id*. Thus, he knew at least two more individuals remained inside the Trailer. *Id.*

Before entering the Trailer, Officer Hahn announced his presence, stated that he had a search warrant, and ordered any other individuals inside the Trailer to exit.

6

*Id.* No one did so. After entering the Trailer, Officer Hahn encountered four more people. *Id.* First, he located an "older gentleman" by the name of Jay Ayala in the northern-most bedroom. *Id.* Again relying upon his prior observations, Officer Hahn knew that Jay Ayala was not one of the occupants of the black Honda. *Id.*

Officer Hahn located the final three individuals in the laundry room: Defendants Moreno and Sanchez, along with a man named Victor Gutierrez. *Id.* Based upon his observations and experience, Officer Hahn reasonably believed that these three men were hiding from police. *Id.*[1] Among other factors, none of these three individuals had complied with the prior order to exit the trailer, and Officer Hahn also recognized Moreno (who was still wearing a gray coat) as the driver of the black Honda, and Sanchez (who was still wearing a black jacket) as the passenger. *Id.* [2]

───────────────

[1] On the shelf above the washer and dryer in the laundry room, Officer Hahn also located a plastic bag containing a small amount of suspect cannabis, a glass pipe commonly used to smoke cannabis, and four cell phones. Gov. Ex. 16; [165]. Officers would later determine that one of these cell phones belonged to Sanchez. [165].

[2] At the motion hearing, Defendant Sanchez disputed that he was, in fact, the passenger in the black Honda, and he called his wife, Stephanie Villagran, to the witness stand. Villagran testified that, on February 20, 2020, she was at her parents' home in North Lake, Illinois, along with Sanchez and their daughter. [165]. At approximately 3:30 p.m., Villagran used her phone to order an Uber for Sanchez. *Id.* The pick-up address for the Uber was Villagran's parents' home in North Lake, and the stated drop-off address (which she received from Sanchez) was 764 Maple Lane, Justice, Illinois. *Id.*; Sanchez Ex. 2. When the Uber arrived at Villagran's parents' home, Villagran observed Sanchez get into the Uber, a Mitsubishi Outlander. [165]. Villagran did not see Sanchez again that day, but the Uber receipt for this ride lists a passenger pick up from Villagran's parent's home at 3:33 p.m., and a drop off address of 764 Maple Lane, Justice, Illinois. *Id.*; Sanchez Ex. 2. The listed destination address is a location very near that of the Trailer (located at 768 Maple Lane, Justice, Illinois). In response to Defendant Sanchez's evidence, the Government submitted supplemental filings showing that the destination reflected in an Uber receipt may not, in fact, reflect the location where the drop off took place. [172-1], [172-2]. These supplemental filings show that when an individual verbally requests a change to his destination mid-ride, the Uber receipt will not necessarily reflect the change. *Id.* Furthermore, Officer Marshall testified that Moreno identified Sanchez as his passenger in the Black Honda by pointing to him at the scene. Later, Chavez also told officers during his post-arrest statement that Sanchez, who he knew as "Guero," arrived with Moreno. Gov. Ex. 15A. Nonetheless, Defendant Sanchez maintains that he arrived via Uber, not in

The officers then placed Moreno, Sanchez, and Victor Gutierrez in handcuffs and relocated them to the living room to perform a protective pat down for weapons. *Id.* Based upon Officer Marshall's experience in narcotics investigations, he knew that narcotics traffickers often carry weapons, and he had reasonable cause to detain the suspects to perform a pat down for the officers' safety while executing the search warrant. *Id.*[3] When Officer Marshall conducted the pat down of Sanchez, he recovered a single gray key with a Dodge symbol from Sanchez's pants pocket. *Id.* At the time when Officer Marshall found the key in Sanchez's pocket, he knew that surveillance officers had previously observed the silver Dodge Neon arrive at the Trailer and saw it perform a counter-surveillance technique. *Id.*

Officer Marshall, using a Spanish translator, took Moreno outside to where the Honda was located, learned from Moreno that Moreno owned the black Honda, and obtained Moreno's voluntary consent to search the car. *Id.* Through the translator, Officer Marshall also asked Moreno about who his passenger was; in response, Moreno pointed to Sanchez. *Id.*

During the search of the black Honda, Officer Marshall also found a set of keys

---

the Honda. The Court need not, however, make any definitive factual finding about exactly how Sanchez arrived at the Trailer, because the agent's identification was credible (and thus constitutes, at worst, an honest mistake), and because Villagran's account of the Uber trip does not necessarily conflict with the officers' testimony. For example, it remains entirely possible that Sanchez could have departed Villagran's parents' home in an Uber and still arrived at the Trailer in the black Honda, if, as the Government suggests, he asked the Uber driver to drop him off near the Trailer early, and then met up with the Honda (and thus wisely reducing his own risk of arrest by shortening his ride in Moreno's transport vehicle containing the narcotics).

[3] Despite the use of handcuffs, the evidence confirms (and this Court finds) that this initial investigative detention did not yet, in fact, amount to an arrest.

from the passenger side door mat pocket, including a gray key bearing a Dodge symbol. *Id.* Based upon Officer Marshall's observations, the Dodge key found in Sanchez's pocket appeared to correspond to the same vehicle as the Dodge key found in the black Honda. *Id.* Officer Marshall then asked Sanchez who owned the Dodge keys and Sanchez confirmed that he did. *Id.*

During the execution of the search warrant, the officers searched Defendant Chavez's bedroom. Upon the TV stand, they found two plastic bags containing approximately 395 grams of cannabis and about 68 grams of a white powdery substance suspected to be cocaine. In addition, officers found a digital scale on the nightstand and fake identification cards containing Defendant Chavez's face paired with a different name. *Id.* at 35:17–35:7, 36:14–22.

Based upon the investigation, officers then arrested Defendants Chavez, Moreno, and Sanchez and transported them to the Hickory Hills Police Department. *Id.*; Gov. Ex. 1 ¶ 44.[4] There, the Defendants provided law enforcement with written *Miranda* waivers and agreed to make post-arrest statements, which were audio- and video-recorded. Gov. Ex. 1 ¶ 45; Gov. Ex. 14, Gov. Ex. 14A; Gov. Ex. 15; Gov. Ex. 15A. Chavez told law enforcement that he sold approximately 196 grams of heroin to the CS; that he had contacted Sanchez to obtain the heroin; and that Sanchez, in turn, acquired the heroin from Moreno. Gov. Ex. 1 ¶ 45. Sanchez told law enforcement that he had

---

[4] At this time, officers also arrested Ernesto Chavez based upon the recoveries from his bedroom of cannabis and suspected drug-dealing paraphernalia (multiple cell phones). [165]. The Government, however, did not indict him as part of this case.

connected Chavez to Moreno in order to obtain the heroin used in the February 20, 2019 narcotics transaction. *Id.* ¶ 46. Moreno told law enforcement that he had transported the narcotics to the trailer. *Id.* ¶ 47.

Sanchez and Moreno also provided their voluntary consent for law enforcement to search their cell phones. Gov. Ex. 1 ¶ 44. This evidenced showed that at approximately 12:20 p.m. on February 20, 2019, Sanchez sent Moreno a message using the WhatsApp messaging application asking Moreno to pick him up. *Id.* ¶ 48. Later, at approximately 2:47 p.m. on February 20, 2019, Sanchez sent a text message to Moreno that stated in effect, "Dude guy called me I'm on my way to isauro [Chavez]'s house" and "ultimately he wants 200 [grams of heroin]." At approximately 4:04 p.m., Sanchez sent another WhatsApp message to Moreno with the address for the trailer. *Id.* ¶ 48.

## II.     Conclusions of Law

Defendants Moreno and Sanchez argue that their arrests violated the Fourth Amendment because law enforcement lacked probable cause to believe that they had committed a crime, and instead relied upon Defendants' mere presence in the Trailer at the time officers searched it to justify their eventual arrests. [78] at 6; [138] ¶ 4. Defendants assert that officers could not have reliably identified them as the occupants of the black Honda, because Officer Hahn did not have sufficient opportunity to view the car's passengers. [168]. Defendant Sanchez also argues that he could not have been the one who arrived in the Honda because he arrived by way of an Uber.

The Government maintains that both arrests complied with the law.

10

Here, the factual record shows that officers possessed probable cause to arrest Defendants, and even if probable cause did not exist at the outset (which it did), the facts confirm that the officers' encounter with Defendants during the execution of the search warrant constituted a lawful investigative detention under *Terry*, which later gave rise to more information further supporting probable cause for their arrest.

## A. The Agents Lawfully Seized the Defendants

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Under the Fourth Amendment, "seizures" are "reasonable only if based on probable cause to believe that the individual has committed a crime." *Lewis v. City of Chi.*, 914 F.3d 472, 476 (7th Cir. 2019) (quoting *Bailey v. United States*, 568 U.S 186, 192 (2013)). Probable cause to justify an arrest exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013).

The probable cause analysis "does not deal with hard certainties," but rather "with probabilities." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Although probable cause requires "something more than a hunch," it does not require a finding that an individual engaged in any unlawful activity. *Abbot v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). It requires "only a substantial chance of criminal activity, not an actual showing of such activity." *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003). This analysis looks at

the relevant circumstances "from the perspective of what the officers knew at the time of the arrest," *Fox v. Hayes*, 600 F.3d 819, 832 (7th Cir. 2010), and "is not a post hoc determination," *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). Probable cause exists even though there "could have been innocent explanations" for a defendant's actions, so long as "the inference of the criminal activity was reasonable." *United States v. Gary*, 790 F.3d 704, 707–708 (7th Cir. 2015) (citing *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003)). The probable cause analysis remains "a fluid concept" based upon "common-sense interpretations of reasonable police officers as to the totality of the circumstances known at the time the event occurred." *United States v. Burnside*, 588 F.3d 511, 518 (7th Cir. 2009). The events leading up to an arrest are viewed from "the standpoint of an objectively reasonable police officer" in light of the officers' training and experience. *Id.* at 518. In assessing probable cause, a court's inquiry remains an objective one; the subjective motivations of the officer cannot invalidate a search or seizure otherwise supported by probable cause. *See Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010).

Additionally, under the "collective knowledge" doctrine, the police officers "who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (internal quotations and citations omitted). In such cases, an arrest occurs lawfully so long as the "collective knowledge of the agency" is "sufficient to constitute probable cause." *Id.*; *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (holding an officer's stop reasonable where

12

justified based upon "the collective knowledge" of officers investigating as part of a joint endeavor, even if the individual arresting officer's firsthand knowledge remains insufficient on its own); *United States v. Ledford,* 218 F.3d 684, 689 (7th Cir. 2000) (if the search or seizure constitutes a "joint endeavor," a court may properly consider what other officers knew and impute that collective knowledge to the officers taking action).

Moreover, *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny also provide an exception to the Fourth Amendment's probable cause requirement, permitting law enforcement to detain a suspect for a brief investigatory stop if they have a "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013) (quoting *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010)). Reasonable suspicion "is more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). It requires "some minimal level of objective justification for making a stop," given the "totality of the circumstances" and "common-sensical judgments and inferences about human behavior." *Id.*; *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) (When determining the reasonableness of an investigative detention, the court should consider the "purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation.").

Lastly, in *Michigan v. Summers*, the Supreme Court held that law enforcement need not have probable cause, or even individualized suspicion, in order to detain those present while officers execute a search warrant. 452 U.S. 692, 703 (1981) ("The

13

existence of a search warrant… provides an objective justification for the detention.").
Thus, officers "have categorical authority to detain any occupant of the subject premises during the search." *United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008); *see also Muehler v. Mena*, 544 U.S. 93, 98 (2005) (holding that police may detain anyone on residential premises being searched pursuant to lawful search warrant, regardless of individual suspicion).

In this case, law enforcement lawfully detained the Defendants under *Summers* and *Terry* while the search warrant was executed—a step which did not yet require probable cause. Nonetheless, as explained below, this Court also holds that probable cause existed to support an arrest of Defendants Sanchez and Moreno when officers first encountered them in the laundry room. Additionally, by the time officers later, in fact, arrested the Defendants under *Gates* (by placing them in police vehicles and transporting them to the police station), the officers possessed additional information more than sufficient to establish probable cause.

### 1.    Probable Cause Existed from the Outset

This Court finds that law enforcement agents possessed probable cause to immediately arrest Sanchez and Moreno when they first encountered them hiding in the laundry room. Indeed, at that time, the totality of the circumstances more than confirmed a reasonable inference that Moreno and Sanchez participated in the sale of narcotics.

First, in monitored communications, Chavez informed the CS that his "guy" would deliver narcotics to the Trailer around 3:30 pm on February 20, 2019. Aside from

14

the CS's own vehicle, the only other vehicle observed at the Trailer was the Defendants' black Honda. Shortly after the black Honda arrived at the Trailer, Chavez informed the CS that his "guy" had just arrived, narcotics in tow, ready to proceed with the sale. These circumstances confirmed to law enforcement that the occupants of the black Honda came to the location to participate in the narcotics transaction. Moreover, having observed no vehicles leave the property or individuals depart on foot, law enforcement reasonably expected that the Honda's occupants remained inside when the search began.

Second, the record confirms that law enforcement reasonably believed that the Defendants were, in fact, the occupants of the black Honda upon encountering them. When Officer Hahn observed the black Honda arrive at the Trailer, he communicated the following descriptions to his fellow officers nearby: the driver of the black Honda was wearing a gray coat; the passenger a black jacket and hat. Upon finding them in the laundry room, Officer Hahn positively identified Chavez and Sanchez as the individuals who arrived at the Trailer in the black Honda. As Officer Hahn had previously observed, Moreno wore a gray coat, and Sanchez, a black jacket.

Third, law enforcement reasonably inferred that Sanchez and Moreno were involved in the criminal activity based upon the context in which officers discovered them. Officer Hahn testified that upon entering the Trailer, he announced his office and the existence of the search warrant and ordered any individuals in the Trailer come out. Sanchez and Moreno did not do so. Thus, based upon the totality of the circumstances here, when Officer Hahn encountered and recognized the Defendants in

15

the laundry room, he reasonably believed that they were hiding from law enforcement.

Taken together, the facts clearly amount to probable cause and "provide ample support for the officers' belief" that Moreno and Sanchez participated in the drug deal between Chavez and the CS, acting as the driver and passenger of the black Honda that delivered the narcotics to the transaction. *United States v. Howard*, 883 F.3d 703, 708 (7th Cir. 2018).

Despite Defendants' claims, the record here differs materially from the facts in *Ybarra v. Illinois*, 444 U.S. 85 (1979), *United States v. Ingrao*, 897 F.2d 860 (7th Cir. 1990), and *United States v. Valentine*, 539 F.3d 88, 94 (2d Cir. 2008)—three cases wherein officers improperly rely upon defendants' mere presence in particular locations. In *Ybarra*, the only fact casting suspicion upon the defendant was his mere presence in the tavern at the time the search warrant was executed. *See Ybarra*, 444 U.S. at 91 (noting that police did not recognize Ybarra and that "Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of suspicious nature to the police officers."). Similarly, in *Ingrao*, the defendant was found in a passageway between two homes where his neighbor, a known narcotics trafficker had previously conducted transactions. *Ingrao*, 897 F.2d at 863–64. There, the Seventh Circuit noted that no other facts connected the defendant to the drug dealer or any narcotics transaction. *Id*. Finally, in *Valentine*, a case from the Second Circuit, the court held that the government lacked any articulable basis for justifying the warrantless arrest of the defendant other than his location and familiarity with the apartment building where

16

he was found. *Valentine*, 539 F.3d at 94.

Unlike the circumstances in *Ybarra*, *Ingrao*, and *Valentine*, where law enforcement relied solely upon the defendant's proximity to a narcotics transaction, the "totality of the facts and circumstances" here clearly warrant "a reasonable, prudent person in believing" that Sanchez and Moreno were involved in the narcotics transaction between the CS and Chavez. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013); *see also United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (holding that the totality of the circumstances—where the defendant met suspected drug dealers at a suspected stash house, where agents knew the dealers had carried out a drug transaction as recently as the day before, and where the defendant left the stash house carrying a shoebox—were sufficient to create probable cause); *U.S. v. McCauley*, 659 F.3d 645 (7th Cir. 2011) (finding probable cause and distinguishing *Ybarra* where police had specific information that two individuals had participated in a particular crime, including the location of where the crime occurred and a description of the perpetrators). Far more than mere location supported officers' decision to stop and ultimately arrest Moreno and Sanchez.[5]

Sanchez argues that the evidence he presented at the hearing—namely the testimony of Villagran and the Uber receipt—demonstrates that he did not arrive at the Trailer in the black Honda. Even assuming this evidence demonstrates that fact

---

[5] Moreover, the fact that officers did not arrest Gutierrez, also found in the laundry room, further illustrates that law enforcement relied upon far more than location or mere happenstance when deciding how to proceed.

(which it does not), the Uber receipt and Villagran's testimony still fail to undermine the officers' reasonable belief that Sanchez and Moreno were involved in the drug transaction between Chavez and the CS. *United States v. Richards*, 719 F.3d 746, 755 (7th Cir. 2013) ("[O]ne can always point out informational gaps, and the probable cause inquiry asks what law enforcement knew rather than what he did not." (internal citation omitted)). Even a mistaken identity, if reasonable at the time, does not invalidate facts amounting to probable cause. *See Hill v. California*, 401 U.S. 797 (1971) ("[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.").

As noted in this Court's factual findings, Officer Hahn honestly and reasonably believed that Moreno and Sanchez were the individuals who arrived in the black Honda to deliver the narcotics. Specifically, Officer Hahn testified that while surveilling the Trailer immediately prior to the narcotics transaction, he observed no other vehicle (aside from the CS's vehicle) enter or exit the location, and he observed no others approach or leave the Trailer on foot. With a sufficient opportunity to observe, Officer Hahn also made credible identifications of the Defendants, which were later corroborated by the clothing Sanchez and Moreno wore when discovered hiding in the laundry room. Based upon the record, Officer Hahn's conclusions remained reasonable, even if he might be, as Defendants claim, ultimately mistaken in his identifications.

Accordingly, the Court finds that probable cause existed to arrest Moreno and Sanchez when law enforcement found them in the laundry room.

18

### 2.    Reasonable Suspicion Supported the Initial Detention

As set forth above, law enforcement possessed probable cause to arrest Sanchez and Moreno (if the officers had chosen to do so) from the moment they discovered the Defendants in the Trailer's laundry room.  But even if officers had lacked probable cause at that point, the factual record still demonstrates that officers only detained Defendants, and that they did so consistent with *Summers* and *Terry* as part of the execution of a valid search warrant.  During the initial detention, officers then became aware of additional facts that further bolstered their probable cause to arrest Sanchez and Moreno.  Thus, by the time officers later placed Defendants in custody, law enforcement certainly possessed probable cause to lawfully effectuate the arrests.

Defendants do not call into question that the underlying search warrant was supported by probable cause, and the record confirms that the officers acted reasonably in executing the warrant.  Thus, officers were entitled to detain Defendants during the search under *Summers*—even without considering the various reasons they had to believe that Defendants acted as the narcotics suppliers.  452 U.S. 692, 703 (1981). Moreover, the evidence set forth above supports a finding of, if not probable cause, then at least reasonable suspicion.  See *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) ("Reasonable suspicion 'is more than a hunch but less than probable cause and considerably less than preponderance of the evidence.'").  Given the totality of the circumstances, officers certainly possessed the "minimal level of objective justification," necessary to justify the limited detention that took place at the Trailer.  *Id.*

Defendants argue that placing them in handcuffs and conducting a protective

19

pat down remained inconsistent with a *Terry* stop.  Not so.

The Seventh Circuit recognizes that inherent dangers exist "in stopping those suspected of drug trafficking, for which guns are known tools of the trade" and thus can warrant "intrusive tactics because of their inherent danger."  *United States v. Askew*, 403 F.3d 496, 507–508 (7th Cir. 2005); *United States v. Radford*, 39 F.4th 377, 387 (7th Cir. 2022) (Where DEA surveillance indicated he "might be involved in drug dealing," defendant's behavior, movements, and "failure to comply with the officer's directives all justified the officer's decision to search for weapons.").  *See also Los Angeles County, Cal. v. Rettele*, 550 U.S. 609, 613 (2007) ("In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search.").

This Court finds that officers acted well within the bounds of the Fourth Amendment when they placed Sanchez and Moreno in handcuffs and performed protective pat downs, and that such actions did not transform the *Terry* stops into arrests.  *United States v. Patterson*, 826 F.3d 450 (7th Cir. 2016) ("[W]e have repeatedly held that a pat-down search does not establish custody for *Miranda* purposes."); *United States v. Shoals*, 478 F.3d 850 (7th Cir. 2007) (collecting cases establishing that an officer's decision to draw a weapon or handcuff a subject, standing alone, does not necessarily lead to the conclusion that the suspect was arrested); *United States v. Anglin*, 626 F. App'x 181, 183–84 (7th Cir. 2015) ("Although we have warned that techniques more commonly associated with formal arrests—like applying handcuffs and drawing weapons—should not become 'the norm during an investigatory

20

detention,' we also have explained that those techniques do not necessarily transform an investigatory stop into a *de facto* arrest.") (citations omitted).

This Court also finds that the initial *Terry* stop, and concurrent execution of the search warrant, revealed further evidence to support probable cause. Officer Marshall testified that when he questioned Moreno about the black Honda, Moreno stated that he owned the black Honda and confirmed that Sanchez was his passenger.[6] Moreno provided consent to search the black Honda,[7] where officers found a Dodge key. The

---

[6] Other than a passing remark by the Government about *Miranda* in its closing argument at the suppression hearing, [168], the parties have not raised any concerns about *Miranda*; and indeed, the Defendants have not challenged any police inquiry based upon *Miranda*. The issue, therefore, is not before this Court, and Defendants have waived any *Miranda* challenge. *United States v. Butler*, 58 F.4th 364 (7th Cir. 2023) (failure to raise or properly develop arguments constitutes waiver). The Defendants' decision to focus their motion elsewhere is not surprising, however, because an investigative stop pursuant to a search warrant is not custody for *Miranda* purposes. *United States v. Bullock*, 632 F.3d 1004, 1017 ("While detention during the execution of a search warrant is not a traditional *Terry* stop, it is sufficiently analogous for us to conclude that, in the usual case, *Miranda* warnings are not required."); *United States v. Patterson*, 826 F.3d 450, 457 (7th Cir. 2016) (routine investigative detention under *Terry* does not constitute custody for *Miranda* purposes); *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010). Likewise, the decision not to raise a *Miranda* challenge here as to any question beyond the consent search process (i.e., "Who was your passenger?') remains, at the very worst, harmless error on their part, because the facts of the initial detention were not significant enough to trigger the need for warnings. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."). Here, as part of the execution of a search warrant, officers merely moved the Defendants together in handcuffs from one room to another room inside the Trailer to perform a brief and justified pat-down for weapons. As to the Defendants, the record shows no drawing of guns by the police, no forcible takedowns of offenders, no announcement of arrest, no locking of suspects in police vehicles, no undue investigative delays, or other factors that might create a sufficiently domineering or coercive atmosphere to warrant *Miranda* protections during a lawful *Terry* stop.

[7] Nothing in the factual record suggests that law enforcement's questioning of Moreno and Sanchez was coercive or that Moreno's consent to law enforcement to search his car was otherwise involuntary. *See, e.g., United States v. Bernitt*, 392 F.3d 873, 877 (7th Cir. 2004) (finding consent voluntary, even though the defendant was in custody and not advised of his right to refuse because he had been in custody for only a few minutes, was an intelligent adult, and police did not pressure or abuse him). Further, a request for consent to search does not trigger the need for *Miranda* warnings, even in a custodial setting, because such a request does not constitute an interrogation. *United States v. McClellan*, 165 F.3d 535, 544 (7th Cir. 1999); *United States v. Bustamante*, 493 F.3d 879 (7th Cir. 2007).

key matched another key, also found during the *Terry* stop: the one in Sanchez's pocket. When asked, Sanchez confirmed that the keys were his. Law enforcement considered this new information along with the knowledge that the car driven to the January 24, 2020 meeting, observed performing a counter-surveillance tactic, had also been a Dodge. Furthermore, while executing the search warrant, law enforcement located narcotics throughout the Trailer, as well as cannabis and related paraphernalia in plain view in the laundry room where officers had discovered the Defendants hiding.

Accordingly, even if law enforcement lacked probable cause to arrest Moreno and Sanchez when they were first found in the laundry room, law enforcement at least possessed the legal authority to detain them pursuant to *Summers* and *Terry*, and thereafter learned additional facts during the execution of the search warrant, and this, in turn, was more than sufficient to support the probable cause required to lawfully arrest the Defendants.

**B.      Inevitable Discovery Doctrine**

Finally, the Government also argues that the post-arrest statements of Moreno and Sanchez and the search of their phones need not be suppressed under the inevitable discovery doctrine. [85] at 18, [140] at 17. In light of the Court's determination that the Government had probable cause to arrest of Moreno and Sanchez, however, the Court need not address this issue.

### III.    Conclusion

Based upon the above, the Court denies Defendants' Motions to Suppress, [78], [138].

Date:  February 3, 2023

ENTERED:

John Robert Blakey
United States District Judge

23